## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA, | : | |
| SECRETARY OF LABOR, | : | |
| | : | |
|    Plaintiff, | : | |
| | : | |
|    v. | : | CASE NO. 1:18-cv-01290 |
| | : | |
| WH ADMINISTRATORS, INC., | : | |
| BRENDAN TURNER, and, | : | |
| SUSANNE SHEIL, | : | |
| | : | |
|    Defendants. | : | |

### COMPLAINT

1.    Plaintiff R. Alexander Acosta, Secretary of Labor (the "Secretary"), brings this civil action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq*. ("ERISA"), for relief in the form of restitution, disgorgement of profits, and other equitable remedies to redress violations and breaches of fiduciary duties, and to obtain such further equitable relief appropriate under ERISA. 29 U.S.C. §§ 1105, 1109(a), 1132(a)(2), (5).

2.    ERISA is specifically intended to protect the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts. 29 U.S.C. § 1001(b).

3.    ERISA requires fiduciaries who manage plan assets to act solely, exclusively and prudently in the interests of plan participants and to administer plans in accordance with plan documents. 29 U.S.C. § 1104(a)(1)(A), (B) and (D).

4.      ERISA prohibits fiduciaries from using plan assets for their own benefit.  29 U.S.C. § 1106(b).

5.      When ERISA's strict fiduciary standards are not met, the Secretary has the authority to seek relief to restore plan losses, to recover unjust profits, and to obtain other remedial and equitable relief.  29 U.S.C. §§ 1109 and 1132(a)(2) and (5).  The Secretary may also seek to enjoin a breaching fiduciary from acting as a fiduciary or service provider to employee benefit plans in the future.

6.      This case involves the failure of WHA Administrators, Inc. ("WHA") and its corporate officers, Brendan Turner and Susanne Sheil ("Defendants") to pay covered medical claims that accrued under ERISA-covered health and welfare plans.  Defendants sold the health and welfare plans to employers under the false premise that "premiums" paid by employers would be sufficient to cover all medical claims that accrued under the plans and that the employers would not be required to submit any additional payments aside from a set monthly administrative fee.  Despite these well-documented representations of the Defendants, adjudicated but unpaid medical claims stand at over approximately $8 million.  More significantly, this number continues to grow as twenty-one employers, who have enrolled nearly 1,000 employees, continue to participate unwittingly in health and welfare plans which cannot provide the payment for the medical care promised by Defendants.

**BACKGROUND**

7.      Defendants design, promote, sell, implement, and administer ERISA-covered health and welfare employee benefit plans for their employer clients.  From 2013 until the present time, Defendants designed, implemented, and administered welfare plans ("WHA Plans") for over one hundred employers and received into bank accounts that they controlled employer and employee

contributions intended to pay the medical expenses for thousands of employees.

8.      Defendants induced the employers to adopt, and thousands of employees to participate in, WHA Plans on the false representation that WHA welfare plans were fully funded through the payment of contributions that limited the liability of the employers and employees to no more than the payment of fixed monthly contributions (also referred to by WHA as "premiums") and compliance fees.  Defendants knew that WHA was not an insurance carrier and failed to take steps to insure that, consistent with their representations, the employers and employees' liability under the WHA Plans would not exceed their monthly contributions and compliance fees.

9.      After Defendants induced several employer clients to pay monthly fees and premiums to WHA for the purpose of having Defendants hold these assets in trust to administer the employers' employee welfare benefit plans, Defendants failed to implement and administer the plans prudently and loyally for the sole benefit of the plans' employee participants.

10.      Employers reasonably relied on the false representations of Defendants and their insurance broker agents to their detriment in the form of millions of dollars in unpaid medical expenses.  To date, the claims administrator for the WHA Plans has adjudicated over $8 million in claims, all of which await payment by WHA.[1]

11.      Although many employers have sought alternative medical plans for their employees, twenty-one employers continue to participate in WHA Plans.  For these employers alone, over $4.2 million in claims have been adjudicated but not paid.

12.      The amount of adjudicated but unpaid claims continues to grow for the twenty-one

---

[1] Claims adjudication is the process which health insurance companies use to determine the amount of a medical claim for which they are financially responsible.  Here, the claims adjudicator hired by WHA has determined that over $8 million in medical claims are covered by the WHA Plans, but WHA has failed to pay these claims.

employers still participating in a WHA Plan as the employer contributions to the WHA Plans are far less than the amount needed to pay covered medical expenses.

13.    Thus, employees who participate in WHA Plans continue to rely on health care coverage that is not sufficiently funded to pay for covered medical services.

14.    Each of the Defendants is a fiduciary liable to the WHA Plans for their failure to ensure that the WHA Plans are (and were) properly funded, adequately insured, and prudently administered for the purpose of paying the medical expenses of the plans' participants.

15.    Defendants also engaged in self-dealing prohibited transactions by comingling plan assets with WHA's corporate bank accounts, misappropriating plan assets for their own personal use, and collecting improper fees and commissions from third parties dealing with the WHA Plans and their assets.

16.    As a result of these fiduciary breaches and prohibited transactions, Defendants have failed to pay over $8 million in medical claims of the plans' participants and beneficiaries.

17.    The employee participants and beneficiaries continue to suffer harm in the form of likely or actual collection actions from creditors and because they continue to incur medical bills that will not be paid by the WHA Plans.

18.    The Secretary brings this civil action for declaratory and injunctive relief to remove Defendants as fiduciaries and service providers of the employers' WHA welfare plans and to appoint an independent fiduciary to take hold of, control, and equitably distribute the assets of all current and former WHA Plans.  The Secretary also seeks a final judgment to undo the prohibited transactions effected by Defendants, to recover any losses to the WHA Plans, to enjoin permanently all Defendants from acting as ERISA fiduciaries or service providers at any time, and for all other appropriate remedial and equitable relief.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 29 U.S.C. § 1132(e)(1) over this civil action brought by the Secretary to enforce Title I of ERISA.

20.     Venue lies in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(d) because Defendant WHA is incorporated under the laws of Maryland, solicits business from the state of Maryland, conducts business in the state of Maryland, and maintains its offices in Bethesda, Maryland.  The WHA Plans at issue in this civil action are or were administered by WHA in the state of Maryland.

## THE PARTIES

21.     The Secretary is authorized to enforce Title I of ERISA by filing civil actions to obtain remedies redressing violations of the statute.  *See* 29 U.S.C. §§ 1132(a)(2), (5).

22.     On July 23, 2013, WHA was organized under the laws of the Texas.  On June 28, 2016, WHA was converted to a Maryland corporation. WHA is headquartered at 2 Bethesda Metro Center, Suite 450, Bethesda, Maryland 20814.  WHA was the Administrator of the WHA Plans within the meaning of 29 U.S.C. § 1002(16)(A)(i).  At all relevant times, WHA had and exercised discretionary authority and discretionary control respecting the management and administration of the WHA Plans and their assets.  At all relevant times, WHA was a fiduciary with respect to the WHA Plans within the meaning of 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and/or discretionary control respecting management of the WHA Plans and/or exercised any authority or control respecting management or disposition of its assets, and had discretionary authority or discretionary responsibility in the administration of the WHA Plans.

23.     Brendan Turner ("Turner") is a resident of the District of Columbia.  Turner is the owner and Chief Executive Officer of WHA.  Turner individually exercised discretionary authority or discretionary control respecting the payment of claims in connection with the WHA Plans and exercised discretionary authority or discretionary control over other aspects of managing and administering each WHA Plan and its assets.  Therefore, Turner was a fiduciary with respect to the WHA Plans within the meaning of 29 U.S.C. §1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the WHA Plans or exercised any authority or control respecting management or disposition of its assets, and had discretionary authority or discretionary responsibility in the administration of the WHA Plans.

24.     Susanne Sheil ("Sheil") is a resident of the District of Columbia. Sheil is the Chief Operating Officer of WHA. Sheil and Turner are married.  Sheil individually exercised discretionary authority or discretionary control respecting the payment of claims in connection with the WHA Plans and exercised discretionary authority or discretionary control over other aspects of managing and administering each WHA Plan and its assets.  Therefore, Sheil was a fiduciary with respect to the WHA Plans within the meaning of 29 U.S.C. §1002(21)(A), because she exercised discretionary authority and/or discretionary control respecting management of the WHA Plans or exercised any authority or control respecting management or disposition of its assets, and had discretionary authority or discretionary responsibility in the administration of the WHA Plans.

**FACTUAL ALLEGATIONS**

25.     From 2013 until the current date, as Chief Executive Officer of WHA, Turner exercised actual control over the decision-making processes and day to day operations of WHA.

From 2013 until the current date, Turner also exercised control over WHA's bank accounts and related deposits.

26.    From 2016 until the current date, as the Chief Operating Officer, Sheil exercised actual control over the decision-making processes and day to day operations of WHA.  From 2015 until the current date, Sheil also exercised control over WHA's bank accounts and related deposits.

27.    WHA has knowledge of the actions of Turner and Sheil because Turner and Sheil are officers of WHA.

28.    Turner and Sheil have knowledge of each other's actions because they are officers of WHA, a closely held corporation, they work together in the same office, they consult with one another on a regular basis, and they reside together under a marital union.

29.    WHA currently employs nine individuals.  None of WHA's current employees or officers are certified actuaries or members of the American Academy of Actuaries.  WHA has never employed or contracted for the services of a certified actuary or a member of the American Academy of Actuaries.

30.    WHA is not and has never been licensed by any state to sell insurance.

**A.  WHA's Plan Designs**

31.    WHA's website represents WHA as offering cost effective "insurance" products.

32.    WHA's website states that the company offers uniquely designed health insurance programs for health, dental, vision, critical care, hospital, indemnity, and life insurance.  WHA's website also advertises WHA as an expert in the design of healthcare plans that are compliant with the Patient Protection and Affordable Care Act of 2010 ("PPACA").  Turner is responsible for the content of WHA's website.

33.    WHA offers three types of standard self-insured employee welfare plans for employers: "The Basic Plan", the "PPACA Plan", and the "PPO Plan."  Turner designed WHA's three welfare plans and offers them to employers as standard packages with no variation in plan design for the Basic and PPACA Plans.

34.    Turner designed the three plans himself setting the employer contribution amounts based on prospective employer clients' employee census information along with any related, available medical claims data.  In cases where an employer lacked claims data, Turner states that he relied on medical claims data he obtained from his former employer, the Boon Group, as a proxy.

35.    Turner's welfare plan models are predicated on the assumption that employers would require all of their employees to enroll in WHA's plans and make related contributions to fund the plans.

36.    Turner additionally assumes that all of each employer's plan participants will be treated as one risk pool for purposes of off-setting liabilities and paying claims among plan participants.

37.    Although Turner does not have any specific commitments from medical providers, he establishes employer contribution levels based on the further assumption that the employers' plans will only be required to pay medical claims at no more than 120 percent of the applicable Medicare rates.

38.    Turner also assumes that the employer's required contributions will be used to purchase stop loss insurance.

39.    Turner never had an actuary assess the soundness of his plan designs to insure that the employer contribution rates would be sufficient to meet projected claim demands.

40.     During the course of WHA's existence, the company designed, sold, implemented, and administered welfare plans for over one hundred employers.

41.     As employees complained about significant unpaid medical claims, many employers terminated their relationship with WHA.  However, WHA currently has twenty-one employer clients and administers multiple WHA Plans that offer health and welfare benefits to 974 participants.

### B.  The Promotion of WHA's Products and Services

42.     Since the creation of WHA, Turner promoted WHA's products and services primarily by means of insurance brokers operating throughout the United States.  These brokers informed employers about WHA's welfare plans and solicited contracts on behalf of WHA.  The producer agreements between various insurance brokers and WHA characterize WHA as the issuer of various products, including individual and group insurance policies.

43.     Under the producer agreements with WHA, the insurance brokers are authorized to solicit contracts from employers seeking to purchase WHA's health and welfare plan design and plan administration.

44.     WHA obtained employer clients from twelve to fifteen different insurance brokers with whom Turner contracted and interacted on behalf of WHA. WHA currently maintains business with at least two insurance brokers.

45.     WHA's producer agreements require the insurance brokers to use the sales materials that WHA provides and to transmit to employers the proposals that WHA drafts for the purpose of determining health care coverage.  Pursuant to these producer agreements, Turner and WHA's employees provide information and promotional materials to the insurance brokers to solicit clients and contracts for WHA.

46.    Turner made available to at least one broker a PowerPoint presentation outlining the welfare plan design that WHA offers to its employer clients.

47.    Jas. D. Collier & Co., Inc. ("Collier Insurance"), a broker soliciting clients for WHA under a producer agreement, used the PowerPoint materials from WHA to promote WHA's products and services.

48.    Creative Marketing Solutions, Inc. ("CMS") had a producer agreement with WHA, and it solicited clients for WHA through the use of a PowerPoint presentation that detailed WHA's program.

49.    Turner transmitted by email correspondence the details of WHA's products and services to insurance brokers working with WHA. Turner additionally provided brokers with proposals detailing the maximum cost for the self-funded welfare plans that WHA designs and administers.

50.    Cobbs Allen, an insurance broker who solicited clients for WHA, received by email from WHA an informational "FAQ" outlining the details of WHA's fully funded trust welfare plan arrangement proposed on a maximum cost basis at a guaranteed price, *i.e.*, if the employer pays all billed premiums, all claims accruing under the WHA Plan would be paid with no additional cost to the employer.

51.    Cato & Cato, a broker working under a producer agreement with WHA, used a template plan document from WHA to solicit clients for WHA.

52.    Corey Durbin, a broker working at Arthur J. Gallagher & Company ("Gallagher"), conveyed to his clients the information that Turner provided and followed Turner's instructions regarding the details of WHA's products and services.

53.    Turner informed the brokers soliciting for WHA that their employer clients would

have no liability to pay for medical claims under WHA's plans and that employers' costs would be limited to set monthly premiums and a compliance fee.

54.     Brian Bobby, an account manager at WHA, informed an insurance broker by email that if the employer client is fully up to date on their compliance and premium payments, the maximum out of pocket for a client is limited to the premium payments.

55.     Based on the information insurance brokers received from Turner, some brokers informed prospective employer clients that WHA's welfare plans were "level-funded plans," meaning that the employer was only required to pay a monthly premium payment and compliance fee to cover all of its employees' health care costs, with the exception of any applicable co-payments (which would be paid by the employees themselves).

56.     Based on information insurance brokers received from Turner, some brokers characterized WHA's welfare plans as traditional "insurance" because if the employer paid its premiums to WHA, employees would receive health care coverage with no additional expense to the employer, aside from a compliance fee.

57.     Turner additionally communicated the details of WHA's welfare plans directly to current and prospective employer clients throughout the United States by means of telephone and in-person meetings at the employers' places of business.

58.     As a result of information that Turner transmitted to employers and to brokers, employers understood that they were purchasing fully funded welfare plans for their employees and that the plans would pay for all covered medical expenses at a cost to the employers of no more than monthly premiums and compliance fees.

59.     The employers' understanding that they were purchasing level-funded, limited risk or traditional insurance welfare plans with fixed costs and premiums is consistent with WHA's

contracts and informational materials. WHA's producer agreements state that WHA is the issuer of "individual and group insurance policies." The Service Agreements between WHA and its employer clients list the employers' payment schedules for monthly "premiums" and "compliance fees," fixed on a twelve-month basis, covering the cost to establish and administer the employers' welfare plans.

60.   WHA's printed "FAQ" states that WHA's welfare plans are fully funded trusts where the unpredictability of a self-insured plan is offset by a guaranteed priced product payable through a premium that is billed without regard to claims expense.

61.   Turner and the brokers acting at his direction also represented to employers that their welfare plans would be underwritten by a stop loss insurance carrier paid through contributions used to fund the plans. Stop loss coverage is a significant part of the welfare plan risk allocation because stop loss insurance is intended to cover any health costs of the employer clients' employees that are in excess of the premiums the employer paid. Turner represented that the attachment point for the stop loss insurance would be low enough to ensure that any health care costs in excess of the premiums the employers paid would be covered without additional cost to the employer.

62.   The employers' expectations that WHA would obtain stop loss coverage is consistent with WHA's "FAQ" stating that WHA provides a fully funded plan involving the purchase of specific and aggregate stop loss insurance with employee contributions.

63.   Under the Service Agreements between WHA and the employer clients, WHA is responsible for obtaining stop loss coverage for the employer's welfare plan.

64.   Turner informed Collier Insurance that aggregate stop loss insurance ensures that the maximum liability to the plans will not exceed the contributions from the employers.

65.    Turner further informed Cobbs Allen that a plan's liability is no greater than the Blue Cross Blue Shield rates and because of stop loss the plan is protected from large claims.

66.    From 2013 until the end of 2017, Turner made representations with reckless disregard to the actual facts, or with no reasonable basis supporting his representations, to employers and the brokers acting on behalf of WHA regarding the maximum costs that employers would incur when hiring WHA to design, implement, and administer the employers' welfare plans.

67.    By 2015, Turner knew or had reason to know that WHA's employer clients who hired WHA to design, implement, and administer their welfare plans would likely be required to pay more than the stated, fixed premiums in order to fund and insure adequately the WHA Plans. Despite this actual or constructive knowledge, Turner continue to make false representations to employers regarding the maximum costs that employers would incur when hiring WHA to design, implement, and administer the employers' welfare plans.

**C.  WHA's Creation of Individual Welfare Plans for Employer Clients**

68.    In response to solicitations from Turner or brokers representing WHA, employers provided to Turner employee census data for the purpose of obtaining welfare plan proposals along with price quotes for the funding and administration of individual plans.  Turner provided compliance proposals to employers.  The employers reviewed the compliance proposals to learn the details of the premium rates and the related healthcare coverage their employees would receive under the WHA Plans.

69.    WHA's compliance proposals state that the welfare plans are built upon unique underwriting guidelines, meaning a calculation Turner performed based on the total number of employees, the gender percentages of the employee population, and any previous medical claims

experience.

70.    Turner's plan proposals further state that WHA offers a guaranteed cost structure which takes the risk off of the employer's plate and allows for accurate budgeting and project planning.  The "premium" rates in the proposals are set on a twelve-month timeframe.

71.    Employers accept Turner's proposed plan design and related premium payment requirements by signing Turner's compliance proposals in addition to WHA's standard "PPACA Compliance Service Agreement" ("Service Agreement") that Turner's attorney drafted.

72.    The Service Agreements state that WHA is obligated to establish and administer a PPACA compliant medical plan design as outlined in the proposal that Turner provides to the employer.  The Service Agreements provide a schedule for the required monthly "premium" payments, which refer back to the Turner's compliance proposal.

73.    WHA is also required under the Service Agreements to ensure that the plan funding requirements are properly set and that appropriate stop loss protection is in place, if needed.

74.    Based on representations from Turner and the brokers acting at the direction of WHA, the employers who purchased and funded the welfare plans that WHA designed and implemented believed that their obligations to their WHA Plans would not exceed fixed monthly premiums and compliance fees.

75.    Based on representations from Turner and the brokers acting at the direction of WHA, the employers who purchased and funded the welfare plans that WHA designed, implemented, and administered believed that their liabilities to their plans would be limited through WHA's purchase of stop loss insurance.

76.    Based on representations from Turner and the brokers acting at the direction of WHA, the employers who purchased and funded the welfare plans that WHA designed,

implemented, and administered relied upon Turner's representations as a basis for deciding to purchase WHA's welfare plans and services.

77.   Based on representations from Turner and the brokers acting at the direction of WHA, which were transmitted verbally or in writing to the employees through their employers, the employees relied upon Turner's representations as a basis for deciding to participate in and make contributions to their employers' WHA designed welfare plans.

**D.  WHA's Mismanagement of the Welfare Plans**

78.   Each plan administered by WHA from the time of its creation to the current date is an employee welfare benefit plan governed by ERISA.

79.   After employers agree to establish welfare plans through WHA, Turner provides, in some cases, plan documents based on a template that he helped design with the assistance of a consultant, The Phia Group, LLC.

80.   The plan documents identify WHA as the Plan Administrator and named fiduciary with sole, full, and final discretionary authority to interpret all Plan provisions, and to make determinations relating to eligibility for benefits.

81.   Under the plan documents, WHA has authority to administer the plan with the further authority to delegate the adjudication of medical claims to a claims administrator. However, the plan documents expressly state that full and final authority to adjudicate claims and make determinations as to their payability by and under the plan belongs to and resides solely with the Plan Administrator (*i.e.*, with WHA). The plan documents further provide that any appointed claims administrator does not have discretionary authority to make claims payments decisions or interpret the meaning of the Plan's terms.

82.   From January 2015 until December 2016, WHA appointed Benefit Administrative

Systems, LLC ("BAS") as the claims administrator for WHA's plans.

83.    Starting on January 1, 2017, WHA replaced BAS with Cypress Benefit

Administrators ("Cypress").

84.    Under WHA's agreement with Cypress, WHA is responsible for, among other

things, collecting fees and premiums due from employer clients along with determining which

employees are eligible for coverage under the employers' WHA Plans.  Cypress is responsible

for the receipt, adjudication and processing of all medical claims.  Cypress does not pay claims.

WHA is responsible for distributing plan assets and making the final decision about whether a

claim is paid.

85.    On September 28, 2015, Turner opened a non-interest bearing commercial deposit

checking account for WHA, number ending 4497, with Manufacturers and Traders Trust

Company ("M&T Bank").  Turner and Sheil are authorized signatories of the M&T Bank

account number ending 4497.

86.    On September 28, 2015, Turner opened a non-interest bearing trust holding account

for WHA, number ending 4505, with M&T Bank. Turner and Sheil are authorized signatories of

the M&T Bank account number ending 4505.

87.    Under Service Agreements entered into with employers, WHA was required to help

establish individual trust accounts for each employer to hold premium contributions.  WHA

failed to do so as not every WHA Plan had a separate trust account.[2]

88.    In the majority of cases, Turner and Sheil collected the employers' premium

payments and deposited them into one of WHA's bank accounts ending 4505 or 4497 at M&T

---

[2] For employers where individual trust accounts were established, M&T Bank was designated the
directed trustee and WHA had the authority to direct the trustee.  Even though some plans had
established individual trust accounts, WHA did not always forward premium contributions to the
individual trust accounts.

Bank.  After 2015, all employers holding Service Agreements with WHA transmitted premiums

directly to WHA for the purpose of funding their individual welfare plans.

89.     Turner and Sheil authorized the payment of claims from WHA's accounts ending

4505 and 4497 at M&T Bank.  Turner and Sheil also paid claims and expenses for multiple plans

out of both M&T Bank accounts.  Turner and Sheil determined which claims and expenses were

paid.

90.     Under the Service Agreements with WHA, employers are required to remit

premium payments to WHA no later than the tenth day of every month.  WHA is required to

send monthly invoices to employers stating the monthly premium payments based on employee

census data.

91.     After 2015, WHA failed to send invoices for premium payments in a timely manner

to several employers, which prevented them from making the proper and timely premium

payments.

### i.  *Failure to Pay Medical Claims*

92.     Starting in 2016, employers began having problems with WHA paying medical

claims for their employee plan participants.  WHA failed to pay medical claims for several

eligible employees who filed timely claims seeking the payment of expenses covered by their

WHA welfare plans.  Employers attempted to resolve these issues by contacting their broker, the

claims administrator, or WHA, but with no success.

93.     WHA informed some employers that the delay in paying claims was the fault of the

claims administrator.  As the Plan Administrator, however, WHA did not take any action against

the claims administrator to correct alleged claims processing failures.

94.     WHA also denied multiple medical claims that eligible plan participants or their

medical providers properly and timely filed and that were adjudicated as covered claims by the claims administrator.

95.     Today, many employees ostensibly covered by WHA plans have millions of dollars in unpaid claims submitted under the plans that WHA was responsible for administering.  Some employees are receiving collection notices from creditors because of WHA's failure to pay valid outstanding medical claims.

96.     As of April 2, 2018, the total amount of adjudicated but unpaid medical claims incurred by the employees (and their families) of the twenty-one currently-enrolled employers, is over approximately $4.2 million and this amount continues to grow as employer premiums are substantially less than the covered claims.  The current amount of outstanding, unpaid claims for all WHA plans (terminated and current) is over approximately $8 million.

97.     Additionally, as of April 2018, Cypress has stopped processing claims for the currently-enrolled employers.  Thus, claims currently submitted by employee-participants are not being adjudicated.

98.     Under the Service Agreements, WHA is required to provide employers with monthly reporting on all plans and participant eligibility and quarterly reporting on financial matters. WHA is further required to provide an annual accounting and plan audits.  WHA's compliance with this requirement has been inconsistent.

99.     Several employers repeatedly requested plan accountings from WHA, but never received accountings or received inaccurate accountings.

100.    During the time when WHA failed to pay employees' medical claims, Turner transferred thousands of dollars out of the general trust holding account, ending 4505, for his personal use.  Turner loaned $100,000 to Brian Bobby, a friend of Turner's, from the trust

holding account, ending 4505.  Turner also paid several thousand dollars to himself from the trust holding account, ending 4505.

101.    For the years 2016 and 2017, Defendants used over $1.3 million in plan assets from the trust holding account, ending 4505, to pay their insurance broker agents commissions for soliciting business for WHA.

102.    Turner arranged for WHA and Cypress to take additional fees from third parties for performing plan-related work by collecting commissions for himself, Sheil, and WHA by arranging for the plans to obtain services from pharmacy benefits managers ("PBMs") and healthcare networks.  Under an agreement with Cypress, WHA received fifty percent of the rebate payments from the PBMs relating to transactions involving the WHA Plans.  WHA also received fifty percent of added fees charged to the plans that it placed with a healthcare network.

### ii.  *Failure to obtain stop loss coverage and related transactions*

103.    Beginning in late 2015, insurance brokers started having problems obtaining relevant plan documentation from WHA.  In October 2015, Gallagher completed a risk assessment review of WHA's administrative operations and uncovered significant areas of concern following numerous calls, meetings and discussions with WHA.  Gallagher discovered that WHA did not have in place individual or aggregate excess stop loss insurance coverage for 48 of 52 employer clients, despite WHA's receipt of premium payments from the employer clients for such coverage.

104.    Beginning in 2016, many employers were also unable to obtain from WHA, Turner, or Sheil documentation of stop loss coverage.

105.    During the same timeframe, Cobbs Allen discovered that WHA had obtained stop loss coverage for some welfare plans, but the attachment points for coverage were extremely

high, contrary to Turner's representations that WHA would obtain coverage with low attachment points for those plans.  In the few cases where WHA obtained stop loss coverage, coverage was limited to specific excess claims over $225,000 with no aggregate excess coverage for the plan as a whole.  In the other words, the stop loss actually purchased by WHA provided coverage only if an individual participant's claims were in excess of $225,000 in any given period, not if the plans' total claims were in excess of $225,000.  Thus the stop loss coverage was inadequate to meet the terms to which WHA had committed itself.

106.    On October 26, 2016, Turner ordered payment in the amount of $2,063,800 from twenty-seven plans' individual employer trust accounts at M&T Bank to fund stop loss insurance coverage for several plans retroactive to January 1, 2016.  Turner paid some of these assets to United States Fire Insurance Company doing business as Crum & Forster for stop loss coverage, but Turner retained over $404,693 in plan assets in WHA's operating account, ending 4497, for the personal use and benefit of Defendants.

107.    At the same time Turner was purchasing stop loss coverage using plan assets, WHA had a "producer override agreement" with Crum & Forster that entitled WHA to commissions from Crum & Forster based on the amount of premium payments that WHA obtained through the placement of policies with the insurance company. Under the producer override agreement, WHA—a fiduciary to the employer plans—obtained over $200,000 in commissions from Crum & Forster during the time that the insurance company was providing stop loss coverage for some of the WHA Plans.

108.    In April 2017, Crum & Forster terminated stop loss coverage for the WHA Plans.

109.    After Crum & Forster terminated stop loss coverage, WHA failed to obtain stop loss coverage for its employer clients from any other provider.

110.    Defendants stated to employers and brokers that Crum & Foster terminated stop loss coverage because it was unable to obtain the required claims information from Cypress for underwriting purposes.  However, as Plan Administrator, WHA never took any action against Cypress in an attempt to rectify the alleged problems in supplying claims information to the insurance carrier.

## CAUSES OF ACTION

### COUNT I
### Fiduciary Breaches

111.    The Secretary re-alleges and incorporates by reference the allegations in Paragraphs 1 through 110 of this Complaint.

112.    The plan documents identify WHA as the named fiduciary and plan administrator of the WHA Plans.

113.    As the plan administrator, WHA is responsible for exercising discretionary decisions regarding the dispensation of benefits under the plans.

114.    WHA, Turner, and Sheil acted as fiduciaries of the plans that WHA administered by exercising control over the plans' assets.

115.    WHA, Turner, and Sheil acted as fiduciaries of the plans that WHA administered by exercising discretionary responsibility in the management of the WHA Plans and by appointing services providers for the WHA Plans.

116.    WHA, Turner, and Sheil acted as fiduciaries of the plans that WHA administered by exercising discretionary responsibility in the administration of the WHA Plans through making eligibility and payment determinations in connection with claims filed by the WHA Plans' participants and beneficiaries.

117.    WHA, Turner, and Sheil violated their duty of loyalty under 29 U.S.C.

21

§ 1104(a)(1)(A) by comingling the WHA Plans' assets with the general assets of WHA.

118.    WHA, Turner, and Sheil violated their duty of loyalty under 29 U.S.C.

§ 1104(a)(1)(A) by improperly failing to pay claims filed by eligible WHA Plan participants and

beneficiaries and by using Plan funds for their personal benefit.

119.    WHA, Turner, and Sheil violated their duty of prudence under 29 U.S.C.

§ 1104(a)(1)(B) by failing to monitor the claims administrator and by failing to correct any

negligent actions on the part of the claims administrator that WHA appointed.

120.    WHA, Turner, and Sheil violated their duty of prudence under 29 U.S.C.

 § 1104(a)(1)(B) by failing to pursue all legal claims and choses in action of the plans to ensure

 that the plans were adequately funded and insured.

121.    WHA, Turner, and Sheil violated their duty of prudence under 29 U.S.C.

§ 1104(a)(1)(B) by failing to ensure that the plans were adequately funded and insured and by

failing to obtain appropriate levels of stop loss coverage.

122.    WHA, Turner, and Sheil violated their duty to act in accordance with the plan

documents and instruments governing the plans under 29 U.S.C. § 1104(a)(1)(D) by failing to

ensure that the plans were adequately funded and insured.

123.    WHA, Turner, and Sheil violated their duty to act in accordance with the WHA

Plan documents and instruments governing the WHA Plans under 29 U.S.C. § 1104(a)(1)(D) by

improperly failing to pay claims filed by eligible participants and beneficiaries.

124.    As a result of the foregoing breaches of fiduciary duties and statutory violations,

WHA, Turner, and Sheil caused monetary losses to the plans for which they are jointly and

severally liable under 29 U.S.C. § 1105(a) and § 1109(a).

125.    WHA, Turner, and Sheil are also each liable for the breaches of their co-

fiduciaries under 29 U.S.C. §§ 1105(a)(1)-(3) because, as described above, they knowingly

participated in or concealed an act or omission, knowing that such an act or omission is a breach;

they enabled the other fiduciaries to commit a breach by breaching their own fiduciary duties

under 29 U.S.C. § 1104(a)(1); and they had knowledge of a fiduciary breach and did not make

reasonable efforts under the circumstances to remedy it.

## COUNT II
### Failure to Hold Assets in Trust

126.    The Secretary re-alleges and incorporates by reference the allegations in

Paragraphs 1 through 125 of this Complaint.

127.    Under the terms of the Service Agreements, WHA was required to establish an

individual trust account for each WHA Plan to hold premium contributions.

128.    WHA, Turner, and Sheil did not establish a separate trust account for each WHA

Plan.  Further, WHA Turner, and Sheil comingled premium contributions remitted by employers

by depositing them into WHA bank accounts.

129.    WHA, Turner, and Sheil violated their duty under 29 U.S.C. § 1103(a) when the

failed to hold assets of the plans in trust.

## COUNT III
### Prohibited Transactions

130.    The Secretary re-alleges and incorporates by reference the allegations in

Paragraphs 1 through 129 of this Complaint.

131.    WHA, Turner, and Sheil engaged in a prohibited transaction under 29 U.S.C.

§ 1106(b)(1) by comingling the plans' assets with the general assets of WHA.

132.    WHA and Turner engaged in a prohibited transaction under 29 U.S.C.

§ 1106(b)(1) by transferring plan assets from various trust holding accounts into WHA's

operating account, ending 4497.

133.     WHA and Turner engaged in prohibited transactions under 29 U.S.C.

§ 1106(b)(1) by transferring plan assets from the trust holding account, ending 4505, to Turner.

134.     WHA and Turner engaged in a prohibited transaction under 29 U.S.C.

§ 1106(b)(1) by transferring plan assets from the trust holding account, ending 4505, to Brian

Bobby.

135.     WHA and Turner engaged in prohibited transactions under 29 U.S.C.

§ 1106(b)(1) by transferring plan assets from the trust holding account, ending 4505, to insurance

broker agents soliciting business for WHA.

136.     As a result of the foregoing prohibited transaction, WHA, Turner, and Sheil

caused monetary losses to the WHA Plans for which they are personally liable under 29 U.S.C.

§ 1105(a) and § 1109(a).

**COUNT IV**
**Prohibited Transactions**

137.     The Secretary re-alleges and incorporates by reference the allegations in

Paragraphs 1 through 138 of this Complaint.

138.     WHA, Turner, and Sheil engaged in prohibited transactions under 29 U.S.C.

§ 1106(b)(3) by receiving consideration for their own interest through the receipt of commissions

from a stop loss insurance carrier in connection with transactions involving the use of plan assets

to purchase insurance coverage for the plans.

139.     WHA, Turner, and Sheil engaged in prohibited transactions under 29 U.S.C.

§ 1106(b)(3) by receiving consideration for their own interest through the receipt of commissions

from pharmacy benefits managers in connection with transactions involving the use of plan

assets to purchase pharmacy services for the plans.

140.     WHA, Turner, and Sheil engaged in prohibited transactions under 29 U.S.C.

§ 1106(b)(3) by receiving consideration for their own interest through the receipt of commissions

from preferred provider networks in connection with transactions involving the use of plan assets

to purchase network services for the plans.

141.     WHA, Turner and Sheil are personally liable under 29 U.S.C. §§ 1132(a)(2) and

(a)(5) for disgorging any profits they received in connection with these prohibited transactions.

## COUNT V
## Equitable Accounting

142.     The Secretary re-alleges and incorporates by reference the allegations in

Paragraphs 1 through 141 of this Complaint.

143.     WHA, Turner, and Sheil violated their duty to file annual reports under 29 U.S.C.

§ 1023(a) and § 1024(a) on behalf of the plans.

144.     WHA, Turner, and Sheil violated their duty of prudence under 29 U.S.C.

§ 1104(a) by failing to provide employers with annual plan accountings as required under the

Service Agreements between WHA and the employers.

145.     The Court is authorized in equity under 29 U.S.C. § 1132(a)(5) to require

Defendants to submit to an equitable accounting conducted by a Court-appointed independent

fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, the Secretary prays that this Court enter an Order:

A.     Requiring each of the defendants, WHA, Turner, and Sheil, jointly and severally, to

restore all losses caused to the plans as a result of their fiduciary breaches or prohibited

transactions;

B.     Requiring each of the defendants, WHA, Turner, and Sheil, to disgorge to the plans

any and all unjust enrichment they received as a result of their fiduciary breaches or prohibited

transactions;

C.    Permanently enjoining each of the defendants, WHA, Turner, Sheil, and anyone acting on their behalf, including their principals, officers, directors, owners, agents, assigns or subsidiaries, from ever acting as a fiduciary or service provider to any plan covered by Title I of ERISA and from marketing or enrolling any employers, professional employer organizations, or participants in any ERISA or non-ERISA covered health plan or any plan purporting to provide any type of medical benefits;

D.    Appointing Receivership Management, Inc. ("Independent Fiduciary") as the independent fiduciary, successor Trustee and Plan Administrator to each WHA Plan, with full and exclusive fiduciary authority over their administration and management, and full and exclusive control over each Plans' assets, including, but not limited to:

      a.   Authority to exercise all fiduciary responsibilities relating to the WHA Plans;

      b.   Authority to take exclusive control of all plan assets of the WHA Plans;

      c.   Authority given to trustees under the terms of the documents governing the WHA Plans;

      d.   Authority to amend the documents governing the WHA Plans;

      e.   Exclusive authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers as the Independent Fiduciary shall, in the Independent Fiduciary's sole discretion, determine are necessary to aid the Independent Fiduciary in the exercise of the Independent Fiduciary's powers, duties, and responsibilities to the WHA Plans;

      f.   Authority to conduct an accounting of all medical claims and negotiate all medical claims;

      g.   Authority to terminate the WHA Plans, if in the best interest of the Plans and, in that event, to establish a claims submission deadline and to adjudicate all claims filed by such deadline and to deny claims not filed by the claims submission deadline;

      h.   Authority to adjudicate and pay or deny any and all claims submitted to the WHA Plans;

      i.   Authority to pursue recovery of monies owed and due to the WHA Plans from any person obligated to make such payments under the terms and conditions of the WHA Plans;

      j.   Authority to identify and pursue recovery of WHA Plans' assets as well as any monies to which the WHA Plans have a right of recovery;

      k.   Authority to identify and pursue claims on behalf of the WHA Plans;

      l.   Except as provided herein, the authority to delegate to such administrators, trustees, attorneys, employees, assigns, agents, and service providers such fiduciary responsibilities as the Independent Fiduciary shall determine appropriate. The Independent Fiduciary may not, however, delegate the authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers or the responsibility to monitor the activities of WHA Plans' trustees, attorneys, agents, and service providers; and

      m.  Authority to pay itself reasonable and necessary fees from the WHA Plans' assets and pay the reasonable and necessary fees of service providers.

   E.   Requiring Defendants, WHA, Turner and Sheil, jointly and severally, to reimburse the fees and expenses of the Independent Fiduciary to the WHA Plans;

   F.  Awarding the Secretary his costs incurred in this civil action; and,

   G.  Awarding such other relief that is equitable and just.

Dated:  May 2, 2018

Respectfully submitted,

KATE S. O'SCANNLAIN
Solicitor of Labor

OSCAR L. HAMPTON III
Regional Solicitor of Labor

JODEEN M. HOBBS
Regional Counsel for ERISA

JESSICA R. BROWN
Senior Trial Attorney

s/ Geoffrey Forney
GEOFFREY FORNEY
Senior Trial Attorney
United States Department of Labor Suite
630 East, The Curtis Center
170 S. Independence Mall West
Philadelphia, PA 19106
215-861-5137/ forney.geoffrey@dol.gov