## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

R. ALEXANDER ACOSTA,
SECRETARY OF LABOR,                           *

      Plaintiff,                          *

v.                                            *       Case No. RDB-18-1290

WH ADMINISTRATORS, INC., *et al.*,            *

      Defendants.                         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
## MEMORANDUM OPINION

Secretary of Labor R. Alexander Acosta ("Plaintiff" or "Secretary") brings this case in his official capacity on behalf of the Department of Labor against Defendants WH Administrators, Inc. ("WHA"), its Chief Executive Officer Brendan Turner ("Turner") and Chief Operating Officer Susanne Sheil ("Sheil") (collectively, "Defendants"), alleging violations of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001, *et seq.* ("ERISA"), by failing to fund their welfare plans, denying legitimate claims by beneficiaries, engaging in various prohibited transactions, and accepting commissions from service providers. (Compl., ECF No. 1.) Currently pending before this Court is Plaintiff's Motion for Summary Judgment (ECF No. 38), which was filed on May 2, 2019 and as to which no responsive pleading has ever been filed. Also pending is Defendants' Motion for Extension of Time (ECF No. 48), which was filed on August 30, 2019. The submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendants' Motion for Extension of Time (ECF No. 48) is DENIED AS MOOT, and Plaintiff's Motion for Summary Judgment (ECF No. 38) is GRANTED.

# BACKGROUND

In ruling on the pending motion for summary judgment, the Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). Defendant WHA and its corporate officers, Turner and Sheil, were in the business of selling and administering self-funded welfare benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

## I. WHA Plans

WHA was organized under the laws of the State of Texas on July 23, 2013, and was subsequently converted to a Maryland corporation. (Certificate of Formation, ECF No. 38-48.) It is headquartered in Bethesda, Maryland. (Answer ¶ 22, ECF No. 22.) Brendan Turner is its owner and Chief Executive Officer, and Susanne Sheil is its Chief Operating Officer. (*Id.* ¶¶ 23, 24.) Turner and Sheil are married. (Sheil Dep. Tr. At 11:5-9, ECF No. 38-27.) Both Turner and Sheil exercised actual control over the decision-making processes and day-to-day operations of WHA. (*Id.* at 10:1-12:13; Turner Dep. Tr. at 17:13-18:4, ECF No. 38-3.) They are the only individuals with signatory authority over WHA's bank accounts at Manufacturers and Traders Trust Company ("M&T Bank"), which holds on deposit the contributions paid by employers and employees to fund the welfare benefit plans that WHA administers. (Sheil Dep. Tr. at 33:4-7, 37:6-8, 47:18-48:6, ECF No. 38-27; Turner Dep. Tr. at 37:5-12, 140:2-12, 143:10-21, ECF No. 38-3.)

WHA designed, implemented, and administered welfare plans for its employer clients under ERISA (the "WHA Plans"). (Answer ¶ 78, ECF No. 22; Turner Dep. Tr. at 12:10-20,

13:11-15, ECF No. 38-3.) Turner himself designed WHA's three types of standard self-insured employee welfare benefit plans for employers: the Basic Plan, the Patient Protection and Affordable Care Act of 2010 Plan ("PPACA"), and the Preferred Provider Organization Plan ("PPO"). (Answer ¶ 33, ECF No. 22; Turner Dep. Tr. at 56:3-57:13, 65:11-12, 104:3-4, 189:2-190:1, 196:3-4, 213:11-21, 223:7-19, 250:9-11, ECF No. 38-3; ECF No. 38-17 at 3.) Under the Plans, the employer's obligation for funding its welfare plans was to be limited to a maximum amount of required premium payments because any claims exceeding the overall premium payments would be covered by stop-loss insurance funded by the employer's premium payments. (Turner Dep. Tr. at 106:19-107:2, 108:5-20, ECF No. 38-3; ECF No. 38-17 at 3.) Turner never had an actuary assess the soundness of his plan designs. (Turner Dep. Tr. at 202:14-21, 204:14-205:11, ECF No. 38-3.)

WHA has designed, sold, and administered welfare plans for over one hundred employers. (Phillips Decl. ¶ 6, ECF No. 38-60; Client List, ECF No. 38-13.) Before July 31, 2018, WHA had approximately fifteen employer clients and administered their related welfare benefit plans. (Sheil Dep. Tr. at 17:18-20, ECF No. 38-27.) As of July 31, 2018, WHA no longer had a third-party administrator assigned to process and adjudicate medical claims for the WHA Plans. (Phillips Decl. ¶¶ 4, 12, ECF No. 38-60.)

## II.     Promotion of WHA products

WHA formed "Producer Agreements" with insurance brokers operating throughout the United States who solicited business on behalf of WHA. (Turner Dep. Tr. at 39:17-41:11, ECF No. 38-3; ECF Nos. 38-49, 38-50, 38-51.) These Producer Agreements required the insurance brokers to use the sales materials that WHA provided and to transmit to employers

3

the proposals that WHA drafted to determine health insurance coverage. (ECF Nos. 38-49, 38-50, 38-51.) The sales materials informed employers that WHA Plans were "level-funded insurance plans," leading many employers to believe they were purchasing fully funded welfare plans for their employees to be funded by paying no more than the stated monthly premium and a compliance fee. (Meyer Decl. ¶¶ 3-4, 12, ECF No. 38-36; Romero Decl. ¶¶ 3, 5, 13, ECF No. 38-39; Ferrell Decl. ¶¶ 4, 12, ECF No. 38-37; Suntrup Decl. ¶¶ 4, 11, ECF No 38-40; ECF No. 38-52 at 6.) Turner also represented to employers that the WHA Plans would be underwritten by a stop-loss insurance carrier paid through contributions used to fund the plans. (Turner Dep. Tr. at 108:5-20, ECF No. 38-3; ECF No. 38-7.)

### III.    Creation of individual welfare plans for employer clients

Turner's compliance proposals state that the welfare benefit plan at issue is "built upon unique underwriting guidelines," which he explained meant a calculation he performed based on the total number of employees, the gender percentages of the employee population, and any previous medical claims experience. (Turner Dep. Tr. at 188:8-189:19, ECF No. 38-3; ECF No. 38-16 at 5.) The proposals further state that WHA offers a "guaranteed cost structure which takes the risk off of the employer's plate and allows for accurate budgeting and project planning." (*Id.*; ECF No. 38-55.) The premium rates in the proposals were set on a twelve-month timeframe. (Turner Dep. Tr. at 227:4-229:10, ECF No. 38-3; ECF No. 38-16 at 8.)

Employers accepted the compliance proposals by signing Compliance Service Agreements, which stated that WHA is obligated to "[e]stablish and administer a PPACA compliant medical plan design as outlined in the proposal" and which provided a schedule for

4

the required monthly premium payments. (Turner Dep. Tr. at 16-19, 226:13-228:10, 228:2-3, ECF No. 38-3; ECF No. 38-19.) The Service Agreements also required WHA to "[e]nsure that funding requirements for the trust are properly set and that appropriate stop loss protection is in place, if needed." (ECF No. 38-19; ECF No. 38-56.) WHA was responsible for determining whether stop-loss insurance coverage was needed for each plan. (Turner Dep. Tr. at 135:7-12, 175:11-13, 242:2-12, ECF No. 38-3.)

## IV. Administration of the welfare benefit plans

The WHA Plans identified WHA as the "Plan Administrator" and "Named Fiduciary" with "sole, full and final discretionary authority to interpret all Plan provisions..." and to "make determinations in regards to issues relating to eligibility for benefits." (ECF No. 38-20 at 2, 4, 48.) WHA had authority to delegate the adjudication of medical claims to a claims administrator. (*Id.* at 8, 47.) Under a Welfare Plan Services Agreement dated January 1, 2015, Defendants appointed Benefit Administrative Systems, LLC as the claims administrator responsible for adjudicating claims filed by participants of the WHA Plans. (Answer ¶¶ 82, 115, ECF No. 22; January 1, 2015 Service Agreement, ECF No. 38-64.) On January 1, 2017, Defendants retained Cypress Benefit Administrators, LLC ("Cypress") as the claims administrator. (Answer ¶ 83, ECF No. 22; WHA-Cypress Service Agreement, ECF No. 38-21.) On July 31, 2018, Cypress stopped providing services to WHA. (Phillips Decl. ¶ 12, ECF No. 38-60.)

Prior to July 31, 2018, under WHA and Cypress's Service Agreement, WHA was responsible for collecting "fees and premiums due from [employer] Clients" along with determining who was eligible for coverage under the employers' plans. (WHA-Cypress Service

Agreement, ECF No. 38-21.) Cypress was responsible for the receipt, adjudication, and processing of all medical claims. (*Id.*) While Cypress was responsible for interpreting the governing plan documents and determining whether eligible plan participants were entitled to medical benefits, WHA was responsible for collecting and distributing plan assets to Cypress so that Cypress could pay the medical claims that it processed for payment. (*Id.*; Turner Dep. Tr. at 76:20-78:9, 80:11-14, 81:16-82:2, 250:4-16, ECF No. 38-3; Sheil Dep. Tr. at 83:18-84:10, ECF No. 38-27.)

Turner and Sheil authorized the payment of claims from two of WHA's accounts at M&T Bank controlled by Turner and Sheil. (ECF No. 39-1 (SEALED); ECF No. 39-3 (SEALED); ECF No. 39-7 (SEALED); ECF No. 39-8 (SEALED).) Although WHA was required under the Service Agreements with its employer clients to help establish individual trust accounts to hold premium contributions, Turner failed to establish a separate trust account for every plan. (Turner Dep. Tr. at 243:15-244:2, ECF No. 38-3; Sheil Dep. Tr. at 49:2-5, ECF No. 38-27; Bobby Decl. ¶ 5, ECF No. 38-61; Romero Decl. ¶ 5, ECF No. 38-39; Suntrup Decl. ¶ 8, ECF No. 38-40; Ferrell Decl. ¶ 7, ECF No 38-37.) Rather, for most plans, Turner and Sheil collected the employers' premium payments and deposited them into one of WHA's bank accounts at M&T Bank, a corporate account or a general trust holdings account, over which both Turner and Sheil have control and signatory authority. (Turner Dep. Tr. at 140:6-8, 141:12-142:7, 143:14-21, 144:7-10, 150:7-14, 158:8-14, ECF No. 38-3; Sheil Dep. Tr. at 37:6-8, 44:13-45:16, 47:18-48:4, 50:4-6, 197:10-15, ECF No. 38-27; Answer ¶¶ 85-86, ECF No. 22.) Turner and Sheil also paid claims and expenses for multiple plans out of both

accounts. (Turner Dep. Tr. at 140:19-141:5, 144:11-13, 147:7-11, 218:11-15, ECF No. 38-3; Sheil Dep. Tr. at 39:7-11; 41:11-17; 50:7-14; 54:11-57:4, 193:15-19, ECF No. 38-27.)

Starting in 2016, employers started having problems with WHA paying medical claims for their employee plan participants. Employers reported that their employees' medical claims were not being paid by WHA. (Meyer Decl. ¶¶ 15-16, ECF No. 38-36; Ferrell Decl. ¶ 14, ECF No. 38-37; Colclasure Decl. ¶¶ 12-13, ECF No. 39-9 (SEALED); Romero Decl. ¶¶ 15-16, ECF No. 38-39; Suntrup Decl. ¶ 13, ECF No. 38-40; Emig Decl. ¶ 11, ECF No. 39-10 (SEALED).) Cypress confirmed that by July 31, 2018, it had processed multiple claims for payment, totally $8,628,745.13 for which WHA failed to provide the necessary funds. (Phillips Decl. ¶ 9, ECF No. 38-60.) As of October 29, 2018, Cypress received additional claims, totaling $18,217,166.40, which remain pending and unprocessed, in part, because WHA directed Cypress not to process many claims. (*Id.*) Despite Cypress's repeated efforts to have WHA provide the necessary monetary funds to pay the claims it had completed and processed for payment, WHA failed to provide or forward the required funds. (*Id.* ¶ 10; Bobby Decl. ¶ 11, ECF No. 38-61.) Employers also tried to resolve WHA's failure to pay by contacting their brokers, the claims administrator, or WHA, but to no avail. (*See* Meyer Decl. ¶¶ 15-16, ECF No. 38-36; Ferrell Decl. ¶ 14, ECF No. 38-37; Colclasure Decl. ¶¶ 12-13, ECF No. 39-9 (SEALED); Romero Decl. ¶¶ 15-16, ECF No. 38-39; Suntrup Decl. ¶ 13, ECF No. 38-40; Emig Decl. ¶ 11, ECF No. 39-10 (SEALED).)

As a result, hundreds of WHA Plans' participant employees have millions of dollars in unpaid claims, and some employees have received collection notices from creditors because of WHA's failure to pay the outstanding medical claims. (*See* Meyer Decl. ¶ 18, ECF No. 38-

36, Ferrell Decl. ¶ 16, ECF No. 38-37; Colclasure Decl. ¶ 15, ECF No. 39-9 (SEALED); Romero Decl. ¶ 18, ECF No. 38-39; Suntrup Decl. ¶ 13, ECF No. 38-40; Emig Decl. ¶ 16, ECF No. 39-10 (SEALED); Hardimon Decl. ¶ 6, ECF No. 39-14 (SEALED).) Cypress's records reflect that WHA has failed to pay over $26.8 million in medical expenses related to claims that Cypress either processed for payment or remain pending. (Phillips Decl. ¶ 9, ECF No. 38-60.) WHA's corporate and trust holding accounts currently have zero dollars. (WHA's current bank statements, ECF No. 39-17 (SEALED).)

On October 26, 2016, Turner ordered payment of $2,063,800 from 27 plans' trust accounts at M&T Bank to fund stop-loss insurance coverage for several plans retroactively to January 1, 2016. (ECF No. 39-15 (SEALED).) He signed the orders for payment and deposited them into WHA's operating account. (*Id.*) Turner then paid $950,000 to the United States Fire Insurance Company, operating as Crum & Forster, to purchase stop-loss coverage. (ECF No. 38-58.) He transferred $709,161.06 into the trust holdings account, but retained in WHA's operating account over $404,693.00 in plan assets intended to fund stop loss coverage. (ECF No. 39-16 (SEALED).) In addition, under WHA's agreement with Crum & Forster, WHA received a 5% commission on premiums for all policies placed with the stop-loss insurance carrier. (Turner Dep. Tr. at 182:14-184:1, ECF No. 38-3; ECF No. 38-14.) WHA received over $166,000.00 in commissions from the stop-loss carrier relating to insurance policies that Turner placed with the WHA Plans. (ECF No. 39-2 (SEALED); ECF No. 39-18 (SEALED).)

WHA also received 50% of the rebate payments from pharmacy benefits managers relating to transactions involving the WHA Plans as well as 50% of some added fees charged

to the plans that WHA placed with a Preferred Provider Organization ("PPO"). (ECF No. 38-21; Turner Dep. Tr. at 90:7-21, 307:14-18, 309:11-19, ECF No. 38-3; ECF No. 38-26; ECF No. 38-19; ECF No. 38-56.) During 2017, WHA retained $104,510.00 in commissions from pharmacy benefit managers and healthcare networks after paying Cypress its share of the commissions. (ECF No. 39-19 (SEALED); Turner Dep. Tr. at 308:6-8, 309:1-5, ECF No. 38-3.) Also in 2017, WHA received over $126,500.00 in commissions from the PPO servicing the welfare benefit plans that WHA administered. (ECF No. 39-20 (SEALED).) The Defendants also used the plan assets paid into the trust account holding to compensate their insurance broker agents over $1.3 million in commissions for soliciting business on behalf of WHA. (ECF Nos. 38-49, 38-50, 38-51; ECF No. 39-21 (SEALED).) Finally, Turner ordered the transfer of $100,000 from the trust holding account to pay off a personal loan, and he paid several thousand dollars to himself from the trust holding account. (ECF No. 38-23; Bobby Decl. ¶ 13, ECF No. 38-61; ECF No. 39-4 (SEALED); ECF No. 39-5 (SEALED).)

**V.     Procedural background**

On May 2, 2018, the Secretary brought the instant Complaint against Defendants alleging violations of ERISA by failing to fund their welfare plans, denying legitimate claims by beneficiaries, engaging in various prohibited transactions, and accepting commissions from service providers. (Compl., ECF No. 1.) On June 4, 2018, Defendants filed their Answer, denying most of Plaintiff's claims. (Answer, ECF No. 22.) On July 9, 2018, this Court issued a preliminary injunction against the Defendants, by consent of the parties. (ECF No. 30.) On

December 7, 2018, one of Defendants' attorneys withdrew as counsel, citing Maryland Rules of Professional Conduct 19-301.16(b)(5) and 19-301.16(b)(6).[1]

The Secretary filed the pending Motion for Summary Judgment on May 2, 2019. (ECF No. 38.) On August 15, 2019, this Court issued a Show Cause Order, directing Defendants to respond to the pending motion within fourteen days. (ECF No. 42.) Thirteen days later, Defendants' remaining counsel withdrew from the case, as he was no longer employed as Defendant WHA's corporate counsel. (ECF No. 46.) On August 30, 2019, the individual Defendant Turner, writing on his own behalf and on behalf of his co-Defendant wife and the corporate Defendant WHA, moved for an extension of time in order to obtain counsel. (ECF No. 48.) While the Court did not rule upon this motion, it became essentially MOOT as six months expired before this Court issued an appropriate Order. Specifically, on February 13, 2020 this Court issued another Show Cause Order, directing Defendant WHA to demonstrate why it had not obtained counsel within twenty days or risk a default judgment. (ECF No. 51.) Shortly thereafter, this Court scheduled a summary judgment hearing for March 17, 2020. (ECF No. 52.)

On March 5, 2020, upon Defendants' request for yet more time to seek counsel, this Court granted Defendants until the date of the summary judgment hearing, March 17, 2020, to retain counsel. (ECF No. 54.) On March 13, 2020, this Court cancelled the summary judgment hearing due to the circumstances created by COVID-19 and noted that the pending

---

[1] These rules provide for the withdrawal of an attorney who is not receiving compensation for their services or would be burdened by continued representation. *See* Md. R. Attorneys, Rule 19-301.16(b)(5) (authorizing withdrawal where "the client fails substantially to fulfill an obligation to the attorneys' services and has been given reasonable warning that the attorney will withdraw"); Md. R. Attorneys, Rule 19-301.16(b)(6) (allowing withdrawal where "representation will result in an unreasonable financial burden on the attorney or has been rendered unreasonably difficult by the client.").

motions would be decided on the papers without a hearing. (ECF No. 55.) Defendants have not obtained counsel nor have they ever filed an opposition to the Secretary's summary judgment motion.

In the Secretary's presently pending Motion for Summary Judgment, he requests monetary damages commensurate with unpaid claims, disgorgement of unjust profits, and a permanent injunction prohibiting Defendants from acting as ERISA service providers.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bonds v. Leavitt*, 647 F. Supp. 2d 541, 553 (D. Md. 2009). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reaching this determination, a court will construe all facts and corresponding inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but the nonmovant "must bring forth evidence upon which a reasonable fact finder could rely" to defeat the summary judgment motion. *Brooks v. Greater Baltimore Med. Ctr.*, No. RDB-07-2792, 2009 WL 10682039, at *2 (D. Md. Feb. 24, 2009); *accord Celotex*, 477 U.S. at 324.

A party's failure to respond to a summary judgment motion "does not compel this Court to grant the motion." *Id.* at *3. "If the opposing party does not so respond, summary

judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2). Nevertheless, a court "must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). The moving party bears the burden of showing its entitlement to summary judgment on the basis of the uncontroverted facts it has alleged. *See* Fed. R. Civ. P. 56(c).

## ANALYSIS

### I. Defendants' Motion for Extension of Time

On August 30, 2019, Defendants moved for an extension of time in order to obtain counsel. (ECF No. 48.) Without ruling on that motion, the Court allowed Defendants additional time, but finally issued a Show Cause Order six months later, directing Defendant WHA to demonstrate why it had not obtained counsel within twenty days or risk a default judgment. (ECF No. 51.) Shortly thereafter, this Court scheduled a summary judgment hearing for March 17, 2020. (ECF No. 52.) On March 3, 3020, Defendants filed another Motion for Extension of Time to obtain counsel. (ECF No. 53.) This Court granted in part and denied in part Defendants' motion, granting Defendants until the date of the summary judgment hearing, March 17, 2020, to retain counsel. (ECF No. 54.) Accordingly, Defendants' August 30, 2019 Motion for Extension of Time (ECF No. 48) is DENIED AS MOOT.

### II. Plaintiff's Motion for Summary Judgment

The Secretary seeks summary judgment in his favor on several bases: (1) the applicability of ERISA to the WHA Plans and each Defendant's corresponding fiduciary duties; (2) the Defendants' assorted breaches of those fiduciary duties and resulting damages;

and (3) a request for a permanent injunction against Defendants, barring them from acting as a service provider under ERISA. No response has ever been filed to these claims by the corporate Defendant WHA or the individual Defendants Turner and Sheil. The Secretary's supporting evidence has never been challenged. Furthermore, the Defendants have previously consented to preliminary injunctive relief. (ECF No. 30.)

Under ERISA, a fiduciary of an employee benefit plan must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries[,] and[] for the exclusive purpose of[] providing benefits to participants and their beneficiaries[] and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). A fiduciary is also required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(B), (D).

Section 409(a) of ERISA imposes liability for breach of fiduciary duty:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). Accordingly, to establish that Defendants are liable for breach of fiduciary duty, the Secretary must show that: (1) the WHA Plans are governed by ERISA; (2) the Defendants were fiduciaries of the WHA Plans; and (3) the Defendants breached their duties

13

under ERISA, resulting in losses to the WHA Plans. Defendants concede that the WHA Plans are governed by ERISA, but they deny that they were all fiduciaries of the Plans and that they breached their duties under ERISA. (Answer ¶¶ 78, 80, 114, 111-145, ECF No. 22.)

## A. Defendants are fiduciaries of the WHA Plans.

Defendants concede that Defendant WHA is identified in the WHA Plans "as the Plan Administrator and named fiduciary with sole, full, and final discretionary authority to interpret all Plan provisions, and to make determinations relating to eligibility for benefits." (Answer ¶ 80, ECF No. 22.) They deny, however, that Defendant WHA or the individual Defendants Turner and Sheil acted as functional fiduciaries under ERISA. (*Id.* ¶ 114.)

"ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan..." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). There are two types of fiduciaries under ERISA: named fiduciaries and functional fiduciaries. *See Pfahler v. Nat'l Latex Products*, 517 F.3d 816, 828 (6th Cir. 2007). Named fiduciaries are identified in the plan document as required by statute for the establishment of a plan. 29 U.S.C. § 1102(a)(2). A functional fiduciary is one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Accordingly, a party need not be listed in a plan instrument to owe fiduciary duties in the plan's administration. *See Pfahler*, 517 F.3d at 828. Rather, "[a] fiduciary is anyone who exercises discretionary control or authority over the policy's management, administration, or assets." *Canada Life Assur. Co. v. Estate of Lebowitz*, 185 F.3d 231, 236 (4th Cir. 1999) (quoting *Mertens*, 508 U.S. at 251); *see also* 29 U.S.C. § 1002(21)(A). An administrator's authority to

14

determine a claimant's entitlement to benefits is enough to demonstrate fiduciary status. *Varity Corp. v. Howe*, 516 U.S. 489, 511-12 (1996).

Plaintiff has provided ample evidence for this Court to find that the Defendants are all functional fiduciaries under ERISA. Specifically, Plaintiff proffers the WHA Plans that identify WHA as the named fiduciary and providing WHA with "sole, full, and final discretionary authority" to administer its Plans, in addition to contracts with brokers and employers providing that WHA will administer its Plans and determine employer and participant eligibility. (*See, e.g.*, ECF Nos. 38-19 at 1; 38-20 at 47; 38-21 at 4.) Plaintiff also provides documents from M&T Bank showing that Defendants Turner and Sheil had signatory authority over the WHA bank accounts. (*See, e.g.*, ECF No. 38-9 at 3; 38-10 at 2; 38-28 at 3.) Finally, in their respective deposition testimony, Turner and Sheil acknowledged their control over WHA and their direct involvement in individual claim determinations. (*See, e.g.*, Turner Dep. Tr. at 17:13-18:4, 22:2-24:10, ECF No. 38-3; Sheil Dep. Tr. at 10:1-12:13, 169:14-172:21, ECF No. 38-27.)

Despite Defendants' general denials in their Answer, they have not provided any response to Plaintiff's abundant evidentiary support showing that all of the Defendants are, indeed, functional fiduciaries of the WHA Plans under ERISA. Accordingly, this Court finds as a matter of law that Defendants are the functional fiduciaries of the WHA Plans.

**B. Defendants breached their fiduciary duties.**

ERISA imposes strict fiduciary duties to "prevent abuses of the special responsibilities borne by those dealing with plans," such as "self-dealing" and "misappropriation of plan funds." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 15 (1987); *see also Tatum v. RJR Pension*

*Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (calling these duties "the highest known to the law"). These responsibilities include a duty of loyalty and a duty of care. *Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572 (1985). The duty of loyalty requires an administrator to fulfill its obligations under a plan "solely in the interest of the participants and beneficiaries," and to avoid "transacting with interested parties." *Chao v. Malkani*, 452 F.3d 290, 293 (4th Cir. 2006); 29 U.S.C. § 1106(b)(1). The duty of care requires a fiduciary to administer its welfare plans with reasonable prudence. *Chao*, 452 F.3d at 294; 29 U.S.C. § 1104(a)(1)(B). Upon a breach of either duty, the Secretary may sue to hold a fiduciary "personally liable to make good to [its] plan any losses ... resulting from such breach." 29 U.S.C. §§ 1109(a), 1132(a)(2).

In this case, the Secretary asserts that Defendants violated these duties by (1) failing to properly fund the WHA Plans, pay claims, and obtain stop-loss coverage; (2) denying claims on illegitimate grounds; (3) engaging in prohibited transactions; and (4) self-dealing by accepting commissions from third parties.

### 1. Defendants failed to properly fund plans, pay claims, and obtain stop-loss coverage.

A failure to pay premiums in accordance with the terms of an ERISA plan is a breach of the duty of care. *McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012). Likewise, each administrator has a fiduciary obligation to implement its plan in accordance with their terms. *Waller v. Blue Cross*, 32 F.3d 1337, 1342 (9th Cir. 1994). Either violation may be remedied at equity by restoring any resulting losses to the plan assets. *CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011) (affirming use of equitable "surcharge" remedy for fiduciary's

failure to pay premiums). ERISA authorizes the Secretary to seek "appropriate equitable relief ... to redress such violations." 29 U.S.C. § 1132(a)(5).

The undisputed evidence in the record shows that Defendants failed to satisfy their duty of care by failing to ensure that the WHA Plans were properly funded and by failing to pay incurred medical expenses in the total amount of $26,845,911.00. The record reflects assorted informational materials depicting WHA Plans as "fully funded," "guaranteed price," with "cost-effective" products backed by stop-loss insurance. (*See, e.g.*, ECF No. 38-5 at 10; ECF No. 38-6; ECF No. 38-4 at 2-4; ECF Nos. 38-49, 38-50, 38-51.) In addition, Defendant Turner represented that the WHA Plans were fully funded and guaranteed that employers in compliance would not have to pay over their premiums. (*See, e.g.*, ECF No. 38-7; ECF No. 38-8; ECF No. 38-17 at 1-3; Meyer Decl. ¶ 3, ECF No. 38-36; Bobby Decl. ¶ 6, ECF No. 38-61.) The record further shows, however, that the WHA Plans were not fully funded, Defendants failed to pay claims, and failed to obtain stop-loss insurance.

Cypress, a third-party administrator with delegated authority to process claims under the WHA plans, submitted a sworn declaration from its Chief Operating Officer, Marsha Phillips, attesting that as of July 31, 2018, WHA failed to pay $8,628.745.13 in claims that the claims administrators processed and adjudicated. (Phillips Decl. ¶ 9, ECF No. 38-60.) In addition, Phillips attested that as of October 29, 2018, Cypress received additional claims totaling $18,217,166.40, which remain pending and unprocessed. (*Id.*) In addition, the record reflects declarations by various employers indicating Defendants' failure to pay.[2] (*See, e.g.*,

---

[2] Although these declarations are hearsay, evidence does not need to be presented in admissible form at the summary judgment stage. *See Celotex*, 447 U.S. at 324. Moreover, each employer has attested that they would come to trial and testify to the facts stipulated in their Declarations.

Meyer Decl. ¶ 13, ECF No. 38-36; Ferrell Decl. ¶ 14, ECF No. 38-37; Romero Decl. ¶ 15, ECF No. 38-39; Suntrup Decl. ¶ 13, ECF No. 38-40.) The total amount in unpaid claims is $26,845,911.00. The record also shows that WHA currently lacks sufficient funds in its corporate and trust holding accounts to pay the over $26.8 million in outstanding liabilities in medical claims. (ECF No. 39-17 (SEALED).) Defendants' failure to properly fund the WHA plans and pay medical claims resulting in a loss of $26,845,911.00, which they must restore to the Plans, constitutes breach of their fiduciary duties under ERISA.

Defendants' failure to obtain stop-loss coverage also constitutes a breach of their fiduciary duties. Under 29 U.S.C. § 1104(a)(1)(D), fiduciaries shall discharge their duties "in accordance with the documents and instruments governing the plan." *See Waller*, 32 F.3d at 1342. The Service Agreements between WHA and the employers required WHA to "[e]nsure that funding requirements for the trust are properly set and that appropriate stop loss protection is in place, if needed." (Turner Dep. Tr. at 135:7-12, 175:11-13, 242:2-12, ECF No. 38-3; Service Agreement, ECF No. 38-19.) At his deposition, Turner admitted that WHA was responsible under the Service Agreements for determining whether stop-loss coverage was needed for each plan. (Turner Dep. Tr. at 135:7-12, 175:11-13, 242:2-12, ECF No. 38-3.) After 2016, the Defendants did not obtain and maintain stop-loss coverage for the WHA Plans. (*Id.* at 125:12-14, 130:17-131:6; Phillips Decl. ¶ 11, ECF No. 38-60; Bobby Decl. ¶ 9, ECF No. 38-61.) Accordingly, such failure constitutes a breach of Defendants' fiduciary duties, and Defendants must restore $26,845,911.00 to the Plans.

### 2. Defendants denied claims on improper grounds.

Plaintiff also provides ample undisputed evidence that Defendants denied claims on improper grounds. "If a policy insures against expenses, coverage vests when the expenses are incurred." *Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995). In such circumstances, administrators cannot deprive claimants of vested benefits by modifying or altering the governing terms of the plan. *Blackshear v. Reliance Std. Life Ins. Co.*, 509 F.3d 634, 639, 642 (4th Cir. 2007) (noting that benefits for medical procedures vest "when an insured arranges for an begins a particular medical procedure").

Defendants failed to satisfy this standard of care by improperly denying claims for benefits contrary to the terms of the governing plan documents. Plaintiff provides a variety of documentation as evidence of Defendants' improper denials. Specifically, Plaintiff proffers WHA Plan documents explaining WHA is required to pay "covered expenses" which are "incurred" on the date assorted medical services are rendered to a beneficiary. (ECF No. 38-20 at 9, 15, 83.) In addition, the record contains contracts with Cypress requiring WHA to disburse funds within seven business days. (ECF No. 38-21 at 2, 4.) However, Defendants Turner and Sheil testified that, upon cancellation of a plan, they refused to pay numerous outstanding medical claims *before* cancellation was effective, absent a "run-out" provision. (Turner Dep. Tr. at 82:3-83:8, ECF No. 38-3; Sheil Dep. Tr. at 72:15-73:18, ECF No. 38-27.) Such refusal to pay claims violated the governing plan documents and constitutes a breach of Defendants' fiduciary duties.

### 3. Defendants engaged in prohibited transactions.

Defendants also engaged in prohibited transactions constituting breach of their fiduciary duties. ERISA provides that a fiduciary may not "deal with the assets of the plan in

his own interest or for his own account." 29 U.S.C. § 1106(b)(1). This provision has been construed as a categorical bar against self-dealing, as any administrator that favors its own interests over its beneficiaries in its dealings violates its fiduciary duty of loyalty. *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996). Likewise, some circuits have held that failing to separate plan assets from corporate assets contravenes the duty of care. *See Rodriguez v. Herman*, 121 F.3d 1352, 1356 (9th Cir. 1997).

The undisputed facts show that Defendants systematically breached their fiduciary duties by appropriating the plans' assets for their own use and benefit and paying the plans' assets to their insurance brokers to solicit business on behalf of WHA. Notably, Defendants admit taking a personal loan from a trust account. (Answer ¶ 100, ECF No. 22.) This admission, alone, is sufficient to establish a misappropriation of funds and a breach of the duty of loyalty. Plaintiff also provides additional evidence to support this finding. For example, the record contains transfer documents demonstrating that Defendants Turner and Sheil moved $404,693.00 in stop-loss funds to a WHA-owned M&T Bank account. (*See, e.g.*, ECF No. 38-9; ECF No. 38-10; ECF No. 39-15 (SEALED); ECF No. 39-16 (SEALED).) On November 18, 2016, Defendant Turner transferred $100,000 to an individual to satisfy a personal debt. (ECF No. 38-23; Bobby Decl. ¶ 6, ECF No. 38-61.) Finally, the Defendants used plan assets from the M&T Bank trust holding account to pay $1,300,000.00 to several insurance broker agents for providing services to WHA. (Payments to Brokers, ECF No. 39-21 (SEALED).)

Accordingly, Defendants must restore to the Plans a total of $1,804,693.00 relating to their prohibited transactions of using the plans' assets to pay WHA's insurance brokers,

misappropriating payments intended to purchase stop-loss insurance, and paying off the personal debt of Defendant Brendan Turner. Consequently, the total sum the Defendants shall restore to the Plans is $28,650,604.00.

### 4. Defendants breached their duty of loyalty by accepting commissions from third parties.

Finally, the undisputed evidence shows that Defendants breached their duty of loyalty by accepting commissions from third parties. A fiduciary may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). In accordance with traditional trust law, an ERISA administrator who accepts commissions from third parties has violated their duty of loyalty, even when those commissions are provided on reasonable terms. *See Chao v. Malkani*, 452 F.3d 290, 293 (4th Cir. 2006) (holding duty of loyalty proscribes "transacting with interested parties"); *see also Nat'l Sec. Systems v. Iola*, 700 F.3d 65, 94 (3d Cir. 2012) (finding ERISA's statutory language "admits of no exceptions" to the "blanket prohibition" on self-dealing) (internal quotations and citations omitted).

Defendants violated this provision through the receipt of commissions and other payments from organizations that provided services to the welfare plans administered for WHA clients. The evidence shows that, under an agreement with Cypress, which Defendant Turner corroborated in his deposition, WHA received 50% of all rebates and administrative fees, for which Defendants collected $104,510.00. (ECF No. 38-21; Turner Dep. Tr. at 306:3-308:21, ECF No. 38-3; ECF No. 38-26; Commission Checks, ECF No. 39-19 (SEALED).). Defendants also received 50% of added fees under similar arrangements with Preferred Provider Organizations, for which Defendants collected $126,504.00. (ECF No. 38-19 at 2-

21

3; Turner Dep. Tr. at 309:11-19, ECF No. 38-3; ECF No. 39-20 (SEALED).) Finally, Defendants collected $166,175.00 in commissions from the stop-loss carrier relating to insurance policies that Turner placed with the WHA Plans. (Turner Dep. Tr. at 178:3-9, ECF No. 38-3; ECF No. 39-2 (SEALED); ECF No. 39-18 (SEALED).)

Accordingly, Defendants breached their duty of loyalty by accepting commissions from third parties and the total amount that Defendants must disgorge is $397,189.00.

## C. A permanent injunction is appropriate.

On July 9, 2018, this Court issued a preliminary injunction against the Defendants, by consent of the parties, preliminarily enjoining the Defendants from advertising, promoting, offering, selling, or establishing, directly or indirectly, any welfare plan, as defined under 29 U.S.C. § 1002(1) and 29 C.F.R. § 2510.3-1, and preliminarily enjoining Defendants from acting, serving, holding any position, or performing any duties as a welfare plan administrator, as defined under 29 U.S.C. § 1002(16)(A), or a welfare plan fiduciary, as defined under 29 U.S.C. § 1002(21)(A) or 29 U.S.C. § 1102(a). (ECF No. 30.) Plaintiff now seeks a permanent injunction, permanently enjoining the Defendants from serving in any capacity over an employee benefit plan. Under ERISA, the Secretary is authorized to permanently enjoin breaching fiduciaries from acting as an ERISA provider in any fiduciary capacity. 29 U.S.C. § 1132(a)(5); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252 (1993) (affirming removal of fiduciary in breach as appropriate equitable relief); *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991) ("ERISA imposes a high standard on fiduciaries, and serious misconduct that violates statutory obligations is sufficient grounds for a permanent injunction.").

Based on the evidence adduced by Plaintiff, and the serious misconduct by Defendants that violated their fiduciary obligations under ERISA, the Court finds that a permanent injunction is appropriate here. The Secretary's uncontroverted evidence, including the WHA contracts and its executives' testimonies demonstrate the company's promise to adequately fund its plans, and its corresponding failure to do so. Accordingly, the Court will enter a permanent injunction against the Defendants, prohibiting them from acting, individually or collectively, as a fiduciary or service provider for any ERISA-covered employee benefit plan.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Extension of Time (ECF No. 48) is DENIED AS MOOT, and Plaintiff's Motion for Summary Judgment (ECF No. 38) is GRANTED.

A separate Order follows.

Dated: March 26, 2020

Richard D. Bennett
United States District Judge